# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

David Cohan and Susan Schardt,
on behalf of themselves and other
similarly situated persons,
known and unknown,

        Plaintiffs,

        v.

Medline Industries, Inc., *et al.*,

        Defendants.

Case No. 14 C 1835

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

This is a purported class action concerning the Defendants' allegedly improper payment of commissions to their salespeople. Plaintiffs allege: (1) violation of the Illinois Wage Payment and Collection Act (the "IWPCA" or the "Act") on behalf of a putative national class; and (2) violation of several state wage payment statutes on behalf of a putative multi-state class. As to the state wage payment statutes, the individual Plaintiffs allege claims under the New York Labor Law (Cohan) and California Labor Code (Schardt). The Court stayed proceedings on class certification to allow for resolution of the parties' cross-motions for summary judgment on the individual Plaintiffs' claims. [88], [92]. As explained below, Defendants' motion for summary judgment is granted and Plaintiffs' motion is denied.

Prior to discussing the factual background underlying this dispute, and in order to focus the background section on the relevant issues, the Court briefly sets

1

out the parties' general positions. There are two principal disputes here: (1) Did the Plaintiffs perform sufficient work in Illinois for the Act to govern their claims; and (2) Did the commission payments at issue violate the Act, the California Labor Code, or the New York Labor Law. As to the first issue, Plaintiffs spent a number of days in Illinois each year for training and promotional meetings. They claim this was sufficient to trigger the Act. Defendants disagree.

As to the second issue, the wage payment statutes invoked by Plaintiffs do not create independent rights, but instead create a cause of action against employers who fail to pay the wages and commissions they agreed to pay in their employment agreements. The parties disagree as to what commissions the Plaintiffs were entitled to under the agreements here. According to Plaintiffs, they were entitled to commissions based solely on their accounts with sales growth; and accounts where sales declined should not have been factored into their commissions. Plaintiffs' argue that commissions should have been calculated as follows:

| Plaintiffs' Position | | | |
|---|---|---|---|
| | January 2010 Sales | January 2011 Sales | Year-over-year Sales Change | Commission Earned (5%) |
| Account 1 | $500K | $1,500K | + $1,000K | $50K |
| Account 2 | $500K | $100K | − $400K | $0K |
| Account 3 | $500K | $0K | − $500K | $0K |
| Total | | | | $50K |

On the other hand, Defendants argue that the parties agreed to a commission calculation based on the subtraction of sales declines from sales growth. Once that calculation was completed, the commission amount was then computed based upon

the amount of growth that exceeded the amount of decline.  Defendants argue that commissions were appropriately calculated as follows:

| Defendants' Position | | | |
|---|---|---|---|
|  | January 2010 Sales | January 2011 Sales | Year-over-year Sales Change | Commission Earned (5%) |
| Account 1 | $500K | $1,500K | + $1,000K | $50K |
| Account 2 | $500K | $100K | − $400K | − $20K |
| Account 3 | $500K | $0K | − $500K | − $25K |
| Total |  |  |  | $5K |

Plaintiffs claim that Defendants' deductions from their "sales growth" based upon the decline in sales for certain accounts was an illegal deduction from commissions that they had already earned under their employment agreements.  Defendants disagree.  Crucial to this Court's analysis, then, is a determination of how the parties agreed to calculate commissions and when those commissions were "earned."

## I.    Background[1]

Defendant Medline Industries, Inc. is a privately held manufacturer and distributor of healthcare supplies in the United States.  PSOF ¶ 5.  Both Medline Industries and its subsidiary, Defendant MedCal Sales LLC, have their corporate headquarters in Mundelein, Illinois.  PSOF ¶¶ 5, 6.  With respect to the issues addressed in this Opinion, there are no material distinctions between Medline Industries and MedCal Sales.  The Court will thus use the term "Medline" to refer to either or both entities.  Medline employed outside salespeople from around the country as sales representatives in their Advanced Wound Care ("AWC") division.

---

[1] The facts are taken from the parties' Local Rule 56.1 statements.  "DSOF" refers to Defendants' statement of undisputed facts [90], with Plaintiffs' responses where applicable [100].  "PSOF" refers to Plaintiffs' statement of facts [94], with Defendants' responses where applicable [97].

PSOF ¶ 5. Salespersons in the AWC division were assigned a geographic territory, and were responsible for selling AWC products to new or existing clients within that territory. DSOF ¶ 6. The named Plaintiffs, David Cohan ("Cohan") and Susan Schardt ("Schardt"), were each employed as sales representatives in the Defendants' AWC division. PSOF ¶¶ 1, 3. Cohan, a New York resident, sold Defendants' products throughout New York. *Id*. at ¶ 2. Schardt, a California resident, sold Defendants' products in a territory that included California, Nevada and Hawaii. *Id*. at ¶ 4.

### a. Cohan's Employment with Medline

Cohan began working with Medline as a salesperson in the company's General Line division. DSOF ¶ 23. He served in that capacity from 1992 to 2006. *Id*. Cohan's employment as an AWC salesperson in the General Line division was governed by a March 25, 1999 "Employment Agreement." *Id*. at ¶ 24. The Court will refer to that contract as the "Cohan 1999 Agreement." As a General Line salesperson, Cohan was paid a variable commission on every sale, based on profitability, with a bonus based on growth. *Id*. at ¶ 25. The Cohan 1999 Agreement contained the following provisions:

| Cohan 1999 Agreement | |
|---|---|
| Commission | (a) Subject to the provisions hereafter set forth, Medline shall pay to Salesperson commission with respect to the collections of all sales made by Medline to customers in the [Salesperson's] territory . . . provided the collection date of any such sale is on or after the date Salesperson commences performance of his duties.<br><br>(f) Commissions on sales for which the collections are received by Medline prior to the last day of any fiscal month shall be |

4

| | |
|---|---|
| | paid to Salesperson on or about the 15th day of the next calendar month.<br><br>(h) Medline may at any time elect to compensate Salesperson on the basis of a monthly salary plus commissions or on the basis of a commission program. After making such election, Medline may periodically vary the amount of salary and/or the rate of commission pursuant to such election.<br><br>(k) [During the term of the pre-termination notice period set out in the Agreement], commissions shall be deemed earned by Salesperson only if collected prior to the effective date of the termination of this Agreement under any circumstances." |
| Termination | (a) The term of this Agreement shall continue indefinitely, provided, however, that either Salesperson or Medline may terminate this agreement at any time by giving written notice of such termination to the other party, not less than fourteen (14) calendar days prior to the effective date of termination specified in such notice. |
| Governing Law | This Agreement shall be governed in all respects by the laws of the State of Illinois. Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Salesperson hereby consents and submits his person to the jurisdiction of any such Court for such purpose. |

Cohan transitioned to work as a salesperson in the AWC division in December 2007. DSOF ¶ 22. He stayed in that position until his resignation in July 2013. *Id*. Cohan's transition to the AWC division was governed by a November 26, 2007 "Agreement Regarding Continued Employment." *Id*. at ¶ 26. The Court will refer to that agreement as the "Cohan 2007 Agreement." The Cohan 2007 Agreement amended the Cohan 1999 Agreement, such that the 1999 Agreement remained in effect as amended. The 2007 Agreement included the following provisions:

| Cohan 2007 Agreement | |
|---|---|
| Amendment | Employee will transition from the General Line sales force to the Advanced Wound Care ("AWC") sales force. Employee will continue to be employed "at will" and will continue to be subject to the employment agreement executed on March 25, 1999. This Agreement does not terminate or supersede the employment agreement, and does not amend the employment agreement or any other agreement between Employee and Medline, except as expressly provided herein. |
| Commission | The following terms will apply to Employee's continued employment with Medline, and in the event of any inconsistency between these terms and the terms in the employment agreement or any other agreement between Employee and Medline, these terms shall control:<br><br>• Commission plan based on sales growth year over year for assigned territory. |

### b. Schardt's Employment with Medline

Schardt worked as a salesperson in Medline's AWC division for approximately thirteen years, from February 2001 through her termination in July 2014. DSOF ¶ 54. Schardt's employment with Medline was governed by a February 19, 2001 "Employment Agreement" with Medline Industries, Inc. (the "Schardt 2001 Agreement"), and a February 10, 2006 "Employment Agreement" with MedCal Sales, LLC (the "Schardt 2006 Agreement"). *Id*. at ¶ 57. Plaintiffs agree that Schardt's two agreements are substantially identical, and the Court will refer to the agreements collectively as the "Schardt Agreements." [93] at 4. With only minor differences between them, the Schardt Agreements included the following provisions:

| Schardt Agreements | |
|---|---|
| Commission | (a) Subject to the provisions hereafter set forth, MedCal shall pay to Salesperson commissions with respect to the collections of all sales made by MedCal to customers in the [Salesperson's] territory . . . provided the collection date of any such sale is on or after the date Salesperson commences performance of his duties.<br><br>(f) Commissions on sales for which the collections are received by MedCal prior to the last day of any fiscal month shall be paid to Salesperson on or about the 15th day of the next calendar month.<br><br>(h) MedCal may at any time elect to compensate Salesperson on the basis of a monthly salary plus commissions or on the basis of a commission program. After making such election, MedCal may periodically vary the amount of salary and/or the rate of commission pursuant to such election. MedCal may change or vary commission rates at its discretion and further may elect to compensate on a salary plus commission basis, a salary basis, or in any other manner MedCal deems appropriate.<br><br>(k) [During the term of the pre-termination notice period set out in the Agreement], commissions shall be deemed earned by Salesperson only if collected prior to the effective date of the termination of this Agreement under any circumstances." |
| Termination | (a) The term of this Agreement shall continue indefinitely, provided, however, that either Salesperson or MedCal may terminate this agreement at any time by giving written notice of such termination to the other party, not less than fourteen (14) calendar days prior to the effective date of termination specified in such notice. |
| Governing Law | This Agreement shall be governed in all respects by the laws of the State of Illinois. Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Salesperson hereby consents and submits his person to the jurisdiction of any such Court for such purpose. |

Apart from those agreements, in May 2001 Schardt received a memo from then Vice President of AWC Sales, Chris Simpson ("Simpson"), explaining that a compensation plan was going to be "unveiled" during the upcoming Division Sales Meetings, and that the new plan included payment of commissions tied to growth. DSOF ¶ 61.

### c. Annual Compensation Plans

In addition to the above employment agreements, Medline's AWC division released Compensation Plans for its salespeople on a yearly basis that described how commissions would be calculated during that year. PSOF ¶ 20. Those compensation plans were reviewed for the upcoming year at promo meetings typically held in December or January. *Id.* The Compensation Plans from 2004-2007 specify that commissions "are based on monthly sales growth and profitability." [95] at Exs. 1-2. They specify that "growth commissions are calculated" as follows: (2004 monthly sales - 2003 monthly sales) x WC Base Profit % x 20% = Commission. *Id.* They each provide some version of the following example:

| | |
|---|---|
| January 2004 Sales: | $165,000 |
| January 2003 Sales: | - $125,000 |
| Monthly Growth: | = $40,000 |
| X WC Base Profit (%28.5): | = $11,400 |
| X 20%: | = $2,280 (monthly commission) |

The Compensation Plans for 2010-2014 state that the salespeople were entitled to a "commission paid on sales growth." [95] at Exs. 1-2. They did not include any sample calculations. *Id.*

### d. Medline's Calculation of the Commissions at Issue

To calculate year over year sales growth during the relevant time period from 2004-2014, Medline started with the AWC salesperson's invoiced sales for the current month and subtracted their sales from the same month in the prior year. DSOF ¶ 8. Depending on whether the AWC salesperson sold more in the current month, than in the same month the previous year, that calculation could result in a positive sales growth number or a negative sales growth number. *Id*. To calculate commissions based on sales growth, Medline then multiplied the AWC salesperson's sales growth (or decline) by a commission percentage. *Id*. at ¶¶ 9-10. In some years during the relevant time period, commissions were calculated by multiplying the sales growth figure for each product category or "bucket" by a specific commission percentage assigned to that category. DSOF ¶ 9. In other years, the commission percentage was applied to the salesperson's overall territory sales growth. *Id*. at ¶ 10. Whether the sales growth component was calculated by product category or by overall territory, the commission calculation always included all of the AWC salesperson's business – *i.e.*, combining accounts with positive sales growth and accounts with negative sales growth. *Id*. at ¶ 11.

### e. Medline's Monthly Reporting

In addition to the annual Compensation Plans described above, AWC salespersons received at least two other reports detailing their sales growth and their commissions based on sales growth each month: (1) the "Wound Care Commission Summary and Growth Report" and (2) the "Commission Summary by

Item Detail Report" (also referred to as the "Commission Growth Summary Detail Report" or the "Detailed Commission Report"). DSOF ¶ 15. AWC salespersons had access to these reports each month through Medline's intranet.

The Wound Care Commission Summary and Growth Report showed each AWC salesperson's sales for the month as compared to the same month in the prior year, broken down by product groupings for the Salesperson's entire territory. *Id.* at ¶ 16. The Wound Care Commission Summary and Growth Report also included a chart titled "Commission Calculation," which reported commissions for each product category (whether positive or negative) based upon that month's sales growth. *Id.* at ¶ 17. The line labeled "Total Commission" then showed the sum of all commissions for the month, adding the positives and negatives together across all product categories. *Id.* at ¶ 18.

The Commission Summary by Item Detail Report showed sales growth in additional detail, including sales growth by account and by product. *Id.* at ¶¶ 19-20. The Commission Summary by Item Detail Report also includes a column labeled "Commissions $" which listed a positive or negative dollar figure for each account and product. *Id.* at ¶ 19. In this manner, the Report correlated the salesperson's negative sales growth to the salesperson's commissions by account and item, providing the Salesperson with a monthly look at how the negative growth generated negative reported commissions. *Id.* at ¶ 20. Cohan and Schardt both received these types of monthly reports on an ongoing basis from Medline since at least 2009. DSOF ¶ 21. The above mentioned reports, along with other

information, showed both Cohan and Schardt exactly how their commissions were calculated.

### f. Cohan's Understanding of the Commission Plans

At the time of his transition to the AWC sales force, Cohan discussed the fact that his commissions would be based on sales growth year over year for his assigned territory with his new boss, Arthur Singer ("Singer"), and with Medline's then Vice President of AWC Sales, Doug Brown ("Brown"). *Id.* at ¶ 29. As early as January 2008, Cohan received and reviewed the Commission Summary and Growth Report, showing that Medline was including negative sales growth in its calculation of Cohan's commissions. *Id.* at ¶¶ 30-31. In particular, Cohan testified that the negative figures in the February 2008 Commission Summary and Growth Report stood out and caught his attention. *Id.* at ¶ 32. Since at least 2009, when he received and analyzed the Commission Summary by Item Detail Report, it became clear to Cohan that sales decline was included as a negative number in the commission calculations. *Id.* at ¶ 33. According to Cohan, the detail report "exposed everything out there" and made it "very, very apparent," using plusses and minuses, "where all the negatives were coming from." *Id.* at ¶ 33.

In 2009, Cohan complained to Singer about the calculation of commissions, asking: "Where are these negatives coming from? Why?" DSOF ¶ 34. Singer responded, "That's the pay plan. If you don't like it, leave." DSOF at ¶ 34. Also, at an AWC promo meeting in August of 2010 or 2011, Cohan again questioned Medline's inclusion of lost business in the calculation of commissions for the AWC

division.  *Id*. at ¶ 36.  Christine Dorshorst ("Dorshorst"), who became Vice President of AWC Sales in 2011, responded: "This is my biggest pet peeve. You know, you get paid – your number is your number. You get paid over [sic] year over year."  *Id*. at ¶ 36.  According to Cohan, the consistent response from Medline management was "this is the pay plan" and "this is how we do it or go find another job."  *Id*. at ¶ 37.  At a promo meeting in August 2012, manager Michael Carroll ("Carroll") explicitly told Cohan "the negatives are never going away."  *Id*. at ¶ 38.

Cohan testified that no one at Medline ever told him he would earn commissions without factoring in the decline in sales, and that there is no written documentation from Medline stating that negative sales growth would be zeroed out, such that he would earn commissions without considering negative growth.  *Id*. at ¶ 39.  According to Cohan, he and Medline had a "long-standing difference of opinion" and a "fundamental" disagreement about how his commissions should be calculated.  *Id*. at ¶ 40.  Despite this, Cohan understood that Medline factored negative growth into the calculation of his commissions, and he continued to work for Medline as an AWC salesperson until July 2013.  *Id*. at ¶ 41.  Schardt had a similar understanding of the commissions provided by Medline.

### g. Schardt's Understanding of the Commission Plans

Schardt understood from the memo she received in May 2001 that her commissions would be based upon growth under the then new AWC compensation plan.  DSOF ¶ 62.  When she asked what "growth" meant, Schardt was told that to earn commissions based on growth, the sales in her territory for the present year

12

had to be greater than sales in the prior year. *Id*. at ¶ 63. Schardt claims that she first discovered that "negative commissions" were being "removed from her compensation" as part of Medline's commission calculation when she examined the BP Detail Report and the Commission Growth Summary Detail Report a few years after starting her employment with Medline. *Id*. at ¶ 64. According to Schardt, the Wound Care Commission Summary and Growth Report also reported negative growth – "everywhere you see a negative number." *Id*. at ¶ 65.

In June 2003, Schardt's manager, Jeff Rubel ("Rubel"), gave her a five-page memo addressing her frustration with her performance and sales numbers. *Id*. at ¶ 66. The June 2003 memo included a specific example of "Negative Monthly growth" resulting in "Negative Commission," noting: "This is what is having a significant impact on your monthly commissions." *Id*. at ¶ 67. After discussing the June 2003 memo with Rubel, Schardt understood the mechanism through which Medline included negative growth in the calculation of her commissions. *Id*. at ¶ 68. According to Schardt, the June 2003 memo specifically illustrated the very type of "deduction" she now alleges is illegal. *Id*. ¶ 67.

When Schardt approached Rubel and Dorshorst to ask "Why would they be taking money out of our checks?" their consistent response was, "We're not taking them away. The negative number, you add it all up, you subtract the negative, that's your commission. That's not coming out of your check." *Id*. at ¶ 69. On another occasion, when a group of AWC salespersons approached Dorshorst to discuss the impact of the negative numbers, Dorshorst responded "it is what it is" –

which Schardt took to mean "the pay plan is what the pay plan is and it's not going to change." *Id*. at ¶ 70. Schardt admits that no Medline manager ever told her that the negatives did not count or that they would be zeroed out. *Id*. at ¶ 71. Schardt also admits that there is no Medline document that she is aware of that reflects or explains the concept of zeroing out the negative growth so she would be paid only on "positive commissions" as she claims she should have been. *Id*. at ¶ 71. Despite the fact that Schardt and Medline did not "see eye-to-eye" on how commissions should be calculated, Schardt understood as early as 2003 that Medline included accounts with negative sales growth in the calculation of her commissions, and she continued to work for Medline as an AWC salesperson for eleven more years. *Id*. at ¶ 72.

### h. Cohan's Work in Illinois

Cohan's territory as an AWC salesperson consisted of accounts located in New York, including the Bronx, Westchester, Queens, Manhattan, and Long Island. DSOF ¶ 42. Cohan serviced those accounts by conducting in-service training, communicating via phone and text messages, visiting on-site, and supplying information to the customers' internal decision-makers. *Id*. at ¶ 43. Cohan was also expected to generate new customers within his territory, which generally required in-person contact. *Id*. at ¶ 44. Cohan had one account that remained his responsibility after the customer relocated from New York to Illinois, but Cohan did not travel to Illinois to service that account. *Id*. at ¶ 45.

As an AWC salesperson, Cohan attended one national sales meeting per year and two AWC promo meetings per year. *Id*. at ¶ 46. The national sales meetings

lasted three to four days, and were held in the Chicagoland area in alternating years, or sometimes for two years in a row. *Id*. at ¶ 47. The AWC promo meetings lasted two to three days, and were more often than not held in Illinois, although they were sometimes held in other states. *Id*. at ¶ 48. Cohan's travel to Illinois for the national sales meetings and AWC promo meetings prevented him from spending in-person time with the customers in his territory, although he could "put out fires" and handle customer issues that did not need him on-site. *Id*. at ¶ 50. On the whole, Cohan contends that his travel to Illinois prevented him from earning commissions that he would have earned by working out of New York. *Id*. at ¶ 51. Other than attending these meetings, Cohan did not travel to Illinois for any Medline business during the time he worked as an AWC salesperson. *Id*. ¶ 53.

### i. Schardt's Work in Illinois

Schardt's territory as an AWC salesperson consisted of accounts located in northern California, parts of Nevada, and Hawaii. *Id*. at ¶ 73. Schardt did not service any customers located in Illinois. DSOF at ¶ 73. As an AWC salesperson, Schardt traveled to her assigned territory to call on her customers in person, and also visited with customers from her territory at out-of-state conferences. *Id*. at ¶ 74. As an AWC salesperson, Schardt attended one national sales meeting per year and two to three AWC promo meetings per year. *Id*. at ¶ 75. The national sales meetings typically lasted for three and a-half days, and were located both in Illinois and in other states. *Id*. at ¶ 76. The AWC promo meetings were typically one or two days long, and were located in Illinois only about half of the time. *Id*. at ¶ 77.

During both types of meetings, Schardt had limited time to conduct her regular commissioned work of selling Medline products to her customers. *Id*. at ¶ 78. According to Schardt, travel to Illinois for meetings resulted in a sales loss (and therefore a deduction to her commissions) since she was not able to devote her time to making sales in her territory. *Id*. at ¶ 79. Other than attending the above meetings, Schardt did not travel to Illinois for any Medline business. *Id*. at ¶ 80.

## II.   Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a verdict for the non-moving party," and the Court must "construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Liberty Lobby*, 477 U.S. at 255; *see also Carter v. City of Milwaukee*, 743 F.3d 540, 543 (7th Cir. 2014).

## III.   Analysis

### a.   Choice of Law

Before addressing the merits of the present dispute, the Court must first discuss the applicable law. The contracts at issue here all include the following choice of law provision: "This Agreement shall be governed in all respects by the

laws of the State of Illinois. Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Salesperson hereby consents and submits his person to the jurisdiction of any such Court for such purpose." Under Illinois law, choice-of-law clauses are generally enforceable: "the law applicable to a contract is the law intended by the parties." *Smurfit Newsprint Corp. v. Southeast Paper Mfg.*, 368 F.3d 944, 949 (7th Cir. 2004). "When the parties express that intent (such as through a governing law provision), that express intent is generally recognized." *Id.* This includes non-breach of contract "claims that are dependent upon the contract." *Birnberg v. Milk St. Residential Associates Ltd. P'ship, No.* 02 C 0978, 2003 WL 151929, at *14 (N.D. Ill. Jan. 21, 2003); *Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F. Supp. 2d 857, 862 (N.D. Ill. 2002).

Here, Plaintiffs argue that the Illinois choice of law provision means that the Act applies regardless of its territorial limitations. Defendants claim that the choice of law provision is irrelevant, as it cannot expand the Act's territorial limitations. According to Defendants, the designation of Illinois as the applicable law simply means that the Act *may* apply, but only if it would otherwise apply under its own terms.

At the motion to dismiss stage in this litigation, the previously-assigned judge, U.S. District Court Judge Manish Shah, declined to adopt Plaintiff's argument, stating: "I do not adopt Cohan's argument that the Illinois choice-of-law and choice-of-forum provision in the parties' contract entitled Cohan to the protections of the IWPCA." *Cohan v. Medline Indus., Inc.*, No. 14 CV 1835, 2014

17

WL 4244314, at *4 n.3 (N.D. Ill. Aug. 27, 2014). Judge Shah further explained "Cohan's argument is unpersuasive: standard choice-of-law and choice-of-forum contract provisions do not extend the reach of state statutes." *Id*. This decision remains the law of the case, and the Court declines to overturn it. *See Sharp Elec. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 510 (7th Cir. 2009).

Consequently, this Court finds that the choice of law provision does not mean that the Act *automatically* applies to Plaintiffs here. Instead, the Court must determine whether the Act applies to the Plaintiffs based upon its own terms and limitations. *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 386 (7th Cir. 2003) ("if they insist (as they must, because the contract chooses Illinois law) that Illinois law applies, then we must look to the law of Illinois to determine the scope of [Act's] application"); *Int'l Profit Associates, Inc. v. Linus Alarm Corp.*, 971 N.E.2d 1183, 1192 (Ill. App. Ct. 2012) ("choice-of-law and forum-selection provisions will not automatically mandate the application of the Consumer Fraud Act").

### b. Applicability of the IWPCA

The Act states its scope explicitly: "This Act applies to all employers and employees in this State, including employees of units of local government and school districts," but exempting employees of the "State or Federal governments." 820 ILCS § 115/1. The Act does not have an "extraterritorial reach;" rather, its "evident purpose is to protect employees *in Illinois* from being stiffed by their employers."

18

*Glass v. Kemper Corp.*, 133 F.3d 999, 1000 (7th Cir. 1998) (emphasis in original).[2] This includes protecting "an employee who performs work in Illinois for an Illinois employer, even if he resides in another state." *Adams v. Catrambone*, 359 F.3d 858, 863 (7th Cir. 2004). However, the Act does not apply simply because an employee has performed "*any* work in Illinois for an Illinois employer." *Vendetti v. Compass Envtl., Inc.*, No. 06 CV 3556, 2006 WL 3694852, at *2 (N.D. Ill. Dec. 14, 2006) (emphasis added).

In *Adams*, the Seventh Circuit found the Act applicable to a Michigan resident who had performed work in Illinois. *Adams v. Catrambone*, 359 F.3d at 865. The plaintiff in *Adams*, however, had performed "most" of his work in Illinois. *Id.* at 861. Also, in *Baxi*, the Court applied *Adams* to allow for the application of the Act to a non-resident employee who performed work in Illinois where "the overwhelming majority" of that work was done in Illinois. *Baxi*, 2011 WL 3898034, at *14. Apart from the foregoing, the courts have not specifically quantified the requisite amount of work that must be performed in Illinois for the Act to apply. They merely state that plaintiffs must have performed "sufficient" work in Illinois. *Spaulding v. Abbott Labs.*, No. 10 C 199, 2010 WL 4822894, at *6 (N.D. Ill. Nov. 22, 2010); *Baxi*, 2011 WL 3898034, at *14.[3]

---

[2] Plaintiffs request that this Court ignore *Glass* and hold that the Act applies extra-territorially. [93] at 22-23. Based on *Glass*, the Court cannot reach that conclusion. Plaintiffs' citation to Pennsylvania state law is not persuasive.

[3] The Court declines to adopt the test enunciated in *Chen v. Quark Biotech, Inc.*, No. 03 C 5729, 2004 WL 1368797, at *6 (N.D. Ill. June 17, 2004), that the alleged improper payments must have been related to work done in Illinois for the Act to apply. As explained by Judge Dow in *Baxi*, it is unclear whether that standard is appropriate under *Glass* and *Adams*. *Baxi*, 2011 WL 3898034, at *15.

Based upon the record, the Court finds that Plaintiffs here have not performed enough work in Illinois for the Act to apply. *Adams* and *Baxi* applied the Act to employees who had performed a significant amount of work in Illinois. Plaintiffs have not cited to any case law allowing the application of the Act to work in Illinois that was as limited as the Plaintiffs' minimal showing here. The Plaintiffs were only actually present in Illinois for, at most, a few days every year. And, while here, they were engaged primarily in training, not the actual sales work for which Plaintiffs were employed. This limited contact with the state is insufficient for the Court to find that Plaintiffs were "employees in [Illinois]" as required under the Act. To hold otherwise would give the statute an extraterritorial reach, in contravention of *Glass*. It would allow a cause of action under the Act for any employee who travelled to Illinois for brief periods of training, improperly expanding the *Glass* court's determination that the "evident purpose [of the Act] is to protect employees *in Illinois* from being stiffed by their employers." *Glass*, 133 F.3d at 1000 (emphasis in original).

### c. Violation of the IWPCA

Even if the Court were to find that the Act applied to Plaintiffs, it would nonetheless find that Defendants did not violate the Act. The principal purpose of the Act is to ensure that employers honor the wage and payment terms of their employment agreements. 820 ILCS 115/3. The employer must provide "any compensation owed an employee . . . pursuant to an employment contract or agreement between the two parties, whether the amount is determined on a time,

task, piece, or any other basis of calculation." 820 ILCS 115/2. The Act further requires "that the employer honor his contract;" it does not, however, confer rights to compensation that are absent from the employee's contract or employment agreement. S*ee Galietta v. Comdisco Holding Co., Inc.*, No. 02 C 7030, 2003 WL 685645, at *3 (N.D. Ill. Feb. 27, 2003) (quoting *National Metalcrafters v. McNeil*, 784 F.2d 817, 824 (7th Cir. 1986)). "It is well established that an employee can have no claim under the IWPCA unless the employer and employee agreed that the former would compensate the latter for the particular work allegedly performed." *Brown v. Lululemon Athletica, Inc.*, No. 10 C 05672, 2011 WL 741254, at *3 (N.D. Ill. Feb. 27, 2003) (collecting cases).

To prevail under the Act, a plaintiff must show that he had a valid contract or employment agreement entitling him to the claimed payments. *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012); *Stark v. PPM America, Inc.*, 354 F.3d 666, 672 (7th Cir. 2004). An "agreement" under the Act is "broader than a contract," and "requires only a manifestation of mutual assent on the part of two or more persons." *Zabinsky v. Gelber Grp., Inc.*, 347 Ill. App. 3d 243, 250 (Ill. App. Ct. 2004); *Hess*, 668 F.3d at 452. The agreement need not be a "formally negotiated contract," nor must it contain the "formalities and accompanying legal protections of a contract." *Landers–Scelfo v. Corporate Office Sys., Inc.*, 356 Ill. App. 3d 1060, 1067–68 (Ill. App. Ct. 2005). An "employer and an employee, by acting in a manner consistent with an employment agreement, can set the material terms of the

agreement, including the amount of compensation." *Landers–Scelfo*, 356 Ill.App.3d at 1068.

Here, Plaintiffs have not proved an agreement entitling them to the commissions they seek (*i.e.*, commissions derived from a calculation that does not include negative sales growth). Of all the agreement language cited by the Plaintiffs, there is no indication that the calculation of commissions based on growth would exclude the effect that a decline in sales had upon that growth. Nor is there any indication that the commissions were "earned" before the calculation of commissions (by subtracting negative growth) was complete. To the contrary, the record is full of evidence showing that there was no agreement by Medline to pay commissions in the manner sought by Plaintiffs. All of the monthly reports Plaintiffs received and every communication Plaintiffs had with Medline management consistently confirmed that Medline was including negative sales growth in the calculation of Plaintiffs' commissions. DSOF ¶¶ 29-38; 62-70. Plaintiffs admit that no manager ever told them they would be paid commissions without taking into account negative sales growth in their territory, and there are no documents suggesting any agreement formal or informal to this effect. DSOF ¶¶ 39, 71. Also, when Plaintiffs proposed changing the terms of the commission plan to their preferred approach, Medline responded with a simple and clear "No." DSOF ¶¶ 34, 36-38; 69-70. Finally, a number of the annual compensation plans explained that "growth commissions" would be calculated as follows: (2004 monthly sales – 2003 monthly sales) x WC Base Profit x 20% = commission. If the 2003 monthly

sales were greater than the 2004 monthly sales, this would plainly result in a negative commission. Without mutual assent to the commission calculation sought by Plaintiffs, their claims under the Act fail. *Schneider v. Ecolab, Inc.,* No. 14 C 01044, 2015 WL 1402615, at *5 (N.D. Ill. Mar. 25, 2015) ("What Schneider overlooks is that he needs to establish 'a manifestation of mutual assent' from both parties about the purported terms of his employment agreement").

Moreover, Plaintiffs concede that they understood Medline's approach to calculating commissions (*i.e.*, including negative sales growth in the commissions calculation), and continued working as part of the AWC sales force for years thereafter. DSOF ¶¶ 40-41; 72. Under Illinois law, this type of evidence confirms an implied acceptance of Medline's payment terms. *Gallardo v. Scott Byron & Co.*, No. 12-CV-7202, 2014 WL 126085, at *15 (N.D. Ill. Jan. 14, 2014) ("The undisputed facts, however, show that no such agreement existed. Indeed, if any agreement existed, it was an agreement that SBC would not pay Gonzalez for pre- and post-shift work"); *Geary v. Telular Corp.*, 341 Ill. App. 3d 694, 698 (1st Dist. 2003) ("When an at-will employee continues to work after a change in commission plan, he is deemed to have accepted the change"); *Schoppert v. CCTC International, Inc.*, 972 F. Supp. 444, 447 (N.D. Ill. 1997) ("continuing to work over two and one half years while receiving commissions under the new structure must be seen in legal terms as an acceptance . . . grudging and protest-filled as that acceptance may have been"). Given the foregoing, the Court finds that the commission payments at issue here did not violate the Act.

Plaintiffs attempt to avoid this finding by arguing that the protections afforded employees under the Act may not be waived, whether in writing or otherwise. *See O'Brien v. Enotech Construction Serv., Inc.*, 183 F. Supp. 2d 1047 (N.D. Ill. 2002) (releases under Wage Act are void as a matter of law); *Ladegaard v. Hard Rock Concrete Cutters, Inc.*, No. 00 C 5755, 2001 WL 1403007 (N.D. Ill. Nov. 9, 2001) (same). This is a correct statement of law, but does not affect the Court's conclusion here because the use of a commission calculation based in part on declines in sales does not constitute a waiver of the rights provided under the Act. As noted above, the Act only protects the payments provided for in the parties' agreement. Plaintiffs have provided no evidence that they were entitled to a commission calculation that ignored negative sales growth. Instead, the evidence shows that they assented to the opposite approach. Thus, the commissions at issue here comply with the parties' agreements as required under the Act, and thus fail to constitute any waiver of rights under the Act.

### d. The California and New York Claims

The Court reaches the same conclusion with regard to Plaintiffs' claims under California and New York law. The Court finds that Plaintiffs' commissions were not "earned" until the commission calculation (sales growth – sales declines) was completed. Thus, any alleged deduction was not improper under the law, but was in accordance with the parties' agreements.

The New York Labor Law generally protects earned employee wages and commissions from an employer's unlawful deductions. N.Y. Lab. Law §§ 190(1),

193(1). Whether and when "a commission is earned is dependent upon the terms of the agreement providing for such commission." *Gennes v. Yellow Book of New York, Inc.*, 23 A.D.3d 520, 521 (N.Y. App. Ct. 2005). Deductions made *after* the commission is earned are illegal under Section 193. *Id.* ("defendant's compensation policy, which provided for the deduction from the plaintiffs' *earned* commissions in order to compensate for the company's losses, was a violation of Labor Law § 193") (emphasis added). On the other hand, Section 193 does not bar employers from structuring payment plans that include "downward adjustments" in the calculation of commissions, because employers and employees are free to fashion their own agreements regarding when commissions become "earned" wages. *See Pachter v. Bernard Hodes Grp., Inc.*, 10 N.Y.3d 609, 617-18 (N.Y. 2008). As long as the employee is aware of these adjustments, understands them, and acquiesces to them by accepting the end result, this type of "deduction" is not unlawful. *Id.* Moreover, the employee's agreement to the commission plan need not be in writing. *Pachter*, 10 N.Y.3d at 618 ("The lack of a specific written contract is not determinative"). Thus, in *Pachter*, a course of dealings including written monthly statements issued by the employer and accepted by the employee provided "ample support for the conclusion that there was an implied contract under which the final computation of the commissions earned by Pachter depended on first making adjustments [for various costs and expenses]." *Id.*

Similarly, California law protects employees' earned wages (including commissions) from unlawful deductions by their employers. *See* Cal Lab. Code §§

221.[4]   Again, however, the "right of a salesperson or any other person to a commission depends on the terms of the contract for compensation." *Koehl v. Verio, Inc.*, 142 Cal. App. 4th 1313, 1330 (1st Dist. 2006).  Where an employee agrees to a "deduction" that is part of the calculation of earned commissions, the deduction is lawful.  *Id.* at 1332 ("The commission plans between Appellants and Verio provided that, although commissions would be paid at booking (or, in 2002, installation), they were not in fact earned at that time [and were subject to later chargebacks].  This is what Appellants agreed.  This is what Appellants understood. . . . We conclude that Verio's commission plans are enforceable").  The employee's agreement need not be in writing, but can be found to exist in implied contract where the employee received copies of the pay plan, training on the pay plan, and regular commission statements setting forth the alleged deductions, and thereafter continued his or her employment under the terms of the plan.  *See Deleon v. Verizon Wireless*, LLC, 207 Cal. App. 4th 800, 813-14 (2d Dist. 2012) (applying Koehl and other § 221 case law to an analogous claim under § 223); *Prudential Ins. Co. of Am. v. Fromberg*, 240 Cal. App. 2d 185, 189 (Cal. Ct. App. 1966) ("When the parties to a contract perform under it and demonstrate by their conduct that they knew what they were talking about the courts should enforce that intent").

Based upon the Court's prior analysis of the facts underlying Plaintiffs' IWPCA claims, the Court finds that Defendants did not violate the California or

---

[4] It is unclear whether there is a private right of action under Cal. Lab. Code § 221.  *Compare Mouchati v. Bonnie Plants, Inc.*, No. EDCV 14-00037-VAP, 2014 WL 1661245, at *8 (C.D. Cal. Mar. 6, 2014), *with Villalpando v. Exel Direct Inc.*, No. 12-CV-04137 JCS, 2014 WL 1338297, at *18 (N.D. Cal. Mar. 28, 2014).  Because the Court bases its decision here on the merits of Plaintiffs' claims, it reaches no conclusion on whether there is a private right of action under Cal. Lab. Code § 221.

New York laws. There is nothing in the Plaintiffs' employment agreements requiring that their commissions be calculated without reference to sales declines; and there is nothing in the record indicating that Defendants agreed to such a calculation. Instead, Plaintiffs' actions in this matter manifest a clear intent to agree to the commissions as paid by the Defendants. As such, Defendants did not violate the California or New York Labor Laws.

## IV. Conclusion

In light of the foregoing, Plaintiffs' motion for summary judgment is denied. Defendants' motion for summary judgment is granted. The clerk is directed to enter judgment on behalf of Defendants. Civil case terminated.


IT IS SO ORDERED

Dated: March 21, 2016                                    Entered:


_____
John Robert Blakey
United States District Judge